## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ANDRE MOORE,                          )
                                  )
     Plaintiff,          )
                                  )
    v.                      )    Case No. 2:16-cv-01473-TMP
                                  )
CITY OF BIRMINGHAM, *et al.*,          )
                                  )
     Defendants.        )

## <u>MEMORANDUM OPINION</u>

Pending before the court is the Defendants' Motion for Summary Judgment. (Doc. 35). The defendants, the City of Birmingham ("City"), A.C. Roper ("Roper"), and Brian Spoonire ("Spoonire"), filed their motion on September 29, 2017, and they seek to dismiss the plaintiff's complaint in its entirety. The motion has been fully briefed, and the parties have consented to dispositive jurisdiction by a United States Magistrate Judge in accordance with 28 U.S.C. § 636(c). Accordingly, the undersigned enters the following Memorandum Opinion.

## I.    PROCEDURAL HISTORY

Moore filed his original complaint in the Circuit Court of Jefferson County, Alabama, on August 3, 2016 (doc. 1-1, p. 2), and the City, Roper, and Spoonire filed their notice of removal on August 7, 2016 (doc. 1). Moore subsequently moved for leave to amend his complaint on January 12, 2017 (doc. 16). He filed

his First Amended Complaint on February 16, 2017, adding as defendants two Birmingham police officers, Tony Gilchrist ("Gilchrist") and Felicia Sturdivant ("Sturdivant"). (Doc. 17).[1] Moore alleged that Gilchrist and Sturdivant were the two BPD officers who responded to his beauty parlor on September 16, 2014. (Doc. 17, ¶¶ 28-29).

Subsequently, on August 31, 2017, Moore filed a Motion and Brief to Correct Complaint. (Doc. 29). In the motion, Moore sought to substitute Wesley Robinson ("Robinson") and Dexter Cunningham ("Cunningham"), two other Birmingham police officers, for Gilchrist and Sturdivant; consequently, Moore also moved to voluntarily dismiss Gilchrist and Sturdivant. (Doc. 29, p. 1). The court denied the substitution of Robinson and Cunningham in place of Gilchrist and Sturdivant (doc. 30), but granted the voluntary dismissal of Gilchrist and Sturdivant, dismissing the claims against Gilchrist and Sturdivant with prejudice (docs. 30, 31).[2] Accordingly, the following claims remain pending:

- Count I – Violation of Moore's procedural due process rights under the Due Process Clause of the Fourteenth Amendment to the U.S Constitution secured by 42 U.S.C. §1983 against Spoonire.

---

[1] The court granted the Motion for Leave to Amend Complaint on February 24, 2017. (Doc. 19).

[2] In effect, this Order dismissed Counts II and V in their entirety and Count VI against Gilchrist and Sturdivant only. (See docs. 17 and 34). The First Amended Complaint did not contain Count III, skipping from Count II to Count IV. (See doc. 17).

- Count IV – Violation of Moore's liberty rights under the Due Process Clause of the Fourteenth Amendment to the U.S Constitution secured by 42 U.S.C §1983 against Spoonire.

- Count VI – Trespass against Spoonire

- Count VII[3] – Failure to Adequately, Train, Discipline, and Supervise against Roper.

- Count VIII – Agency against the City

The City, Roper, and Spoonire filed a motion for summary judgment on September 29, 2017. (Doc. 35). Moore filed a response in opposition on October 19, 2017. (Doc. 37) In his response, Moore "concedes [that the City] is not vicariously liable for [any] [f]ederal claims" and that he "does not have evidence of a City policy, custom, or practice" sufficient to support a direct claim against the City under Monell v. Dep't of Soc. Servs of City of N.Y., 436 U.S. 658, 690-91 (1978). (Doc. 37, p. 18-19). On November 2, 2017, the City, Roper, and Spoonire filed a reply.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of

---

[3] Moore identifies this as Count VI in the First Amended Complaint, which the court construes to be an apparent mistake.

informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Celotex</u>, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." <u>Id.</u> at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. <u>Celotex</u>, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a

genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communications, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

### III.   FACTS

For purposes of summary judgment, the courts are directed to view the facts in the light most favorable to the non-moving party, in this case, the plaintiff, Andre Moore ("Moore").  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

(1986).  Accordingly, the following facts, taken in a light most favorable to the non-moving plaintiff, are relevant to the instant motion for summary judgment.

Moore has owned and operated Andre's Hair Styling and Barber Training Center ("Barber School") in Birmingham, Alabama, since 2012.  (Doc. 35-3, pp. 15:22 – 16:8; doc. 35-3, p. 30:7-12).  He has been licensed to do so by the Jefferson County Barber Commission.  In late August or early September of 2014, Trina Paulding ("Paulding"), an inspector with the Jefferson County Barber Commission ("JCBC"), visited the Barber School to inform Moore that another inspector, Kay Wallace ("Wallace"), intended to shut down the school because Moore failed to pay the renewal of his license fee.  (Doc. 35-3, pp. 51:2 – 52:14).  Moore had previously written a check to pay the renewal license fee, but the JCBC failed to deposit the check for approximately six months, causing the check to be returned for insufficient funds.  (Doc. 35-3, pp. 51:19 – 52:5).  When he learned that his check had bounced and that his license had not been paid, Moore contacted Wallace, offering to pay approximately $150 that day and to pay the remaining balance on September 4, 2014.  (Doc. 35-3, pp. 53:9 – 54:13).  Wallace accepted the partial payment.  (Doc. 35-3, p. 53:9-18).

On September 4, before Moore could pay the remaining balance, Wallace and Paulding surveilled the Barber School to ensure that Moore was not operating the school without a current license.  (Doc. 35-3, p. 47:1-6).  Although his school

was on vacation the week of September 4, Moore was present at the Barber School to complete administrative work in his office. (Doc. 35-3, pp. 210:9 – 211:3). While Wallace and Paulding observed the Barber School, two students exited the school after receiving copies of tests they had recently missed. (Doc. 35-3, pp. 211:4 – 212:5). Other than Moore, the two students, and Marvin Smith, who was there to perform maintenance, nobody was present at the Barber School on September 4. (Doc. 35-3, pp. 58:18 – 60:14). Before confronting Moore, Paulding requested an officer from the Birmingham Police Department ("BPD") to be present at the scene to "stand by"[4] while she and Wallace shut down the Barber School. (Doc. 35-2, Spoonire Affidavit, pp. 3-4). Spoonire responded to the dispatch and arrived to stand by while Wallace and Paulding ordered Moore to vacate the Barber School. (Id.).

As one of Moore's students was leaving the Barber School, the student called Moore to inform him that Wallace and Paulding were outside of the Barber School with a police officer. (Doc. 35-3, p. 59:16-22). Moore went outside to speak with Wallace, Paulding, and Spoonire and invited them inside after they began to make a scene. (Doc. 35-3, pp. 57:18 – 58:15). Once inside, Moore had a conversation with Wallace and Paulding, who accused him of operating the Barber School without a license. (Doc. 35-3, p. 61:1-18). After informing Wallace and

---

[4] To "stand by" means that the officer is present to ensure that violence does not occur. See doc. 35-2, Spoonire Affidavit, p. 4; doc. 35-2, Spoonire Deposition, pp. 13:8 – 14:1.

Paulding that he was closed and not teaching classes, Moore offered to pay the remaining balance on his license, but Wallace refused to accept money. (Doc. 35-3, pp. 61:1-18, 62:15-21). While Moore discussed the license issue with Wallace, Spoonire stood by with his hand on his gun. (Doc. 35-3, p. 62:22-23). Eventually, Spoonire directed Moore to comply with Wallace's instructions (doc. 35-3, p.63:1-4), and Spoonire escorted Moore out of the Barber School, placing his hand on Moore's arm (doc. 35-3, pp. 76:11 – 77:9, 218:4-10). Spoonire allowed Moore to lock up his building while he escorted Moore out. (Doc. 35-3, pp. 217:9 – 218:23). Wallace instructed Moore to appear before the JCBC on the following Monday to explain why he was operating the Barber School without a current license. (Doc. 35-3, p. 78:6-11).

After the confrontation on September 4, 2014, Moore decided to apply for licenses under the State of Alabama to remove himself from the jurisdiction of the JCBC. (Doc. 35-3, pp. 94:6 – 95:23; 96:19 – 98:6). By September 15, 2014, Moore possessed an instructor license, beauty salon license, barber shop license, and school license through the State of Alabama Cosmetology Commission. (Doc. 35-3, p. 101:18-22). Additionally, Moore contacted BPD's Chief Deputy Alan Hatcher ("Hatcher") on some date between September 5 and 15, 2014, who

stated that "his men" should not have been at the Barber School on September 4.[5] (Doc. 35-3, p. 101:4-15). Because Moore possessed licenses under the State of Alabama, Hatcher also explained to Moore that the JCBC no longer had jurisdiction over him.[6] (Doc. 35-3, p. 101:4-15).

On September 16, 2014, Moore was operating a beauty salon, but he was not teaching cosmetology or barbering at the Barber School.[7] (Doc. 35-3, pp. 91:12-22; 109:19-21). Wallace and Paulding came into the Barber School unannounced, and Wallace instructed Paulding to take pictures of Moore operating the Barber School without a license. (Doc. 35-3, pp. 107:2 – 108:7). Furthermore, Wallace told Moore that he was "not supposed to be operating." (Doc. 35-3, p. 110:7-15). At that point, Moore took Wallace into his office to explain to her that she did not have jurisdiction and that he possessed licenses through the State of Alabama.

---

[5] While included here, this evidence does not create a genuine issue of fact to be taken in a light most favorable to Moore. At first blush, Moore's testimony recounting Hatcher's statement appears to be hearsay, and it is unclear whether the statement falls under one of the categories of non-hearsay contained in Federal Rule of Evidence 801(d). Even if it is not hearsay, Hatcher's statement does not create a genuine issue of material fact because Moore provided Hatcher only with his version of the events, not the officer's version. In other words, Hatcher possessed only one side of the events during Moore's telephone call. Hatcher's statement cannot serve as an authoritative statement on whether Spoonire or the other officers acted with authority on September 4 and 16, 2014.

[6] Once again, assuming as true that Hatcher made this statement, it is Hatcher's expression of a legal conclusion. Such a conclusion is not authoritative as to whether or not the Jefferson County Barber Commission did or did not have jurisdiction over the plaintiff's business.

[7] For the sake of clarity, on September 16, 2014, Moore operated the Barber School as a beauty salon and not as a school. Therefore, reference to the Barber School on September 16, 2014, in this paragraph and the succeeding two paragraphs should be interpreted as "beauty salon."

(Doc. 35-3, p. 110:7-15). Either Wallace or Paulding then called BPD to request an officer to "stand by" while the two of them closed the Barber School. (Doc. 35-3, pp. 108:18-22, 111:2 – 112:14). At least two BPD officers arrived at the Barber School in response to the dispatch. (Doc. 35-3, p. 113:19-22). Wallace explained her position to the BPD officers, and Moore explained his license issue to the BPD officers. (Doc. 35-3, p. 114:9-19). Wallace and Paulding, along with the BPD officers, told everybody to vacate the Barber School. (Doc. 35-3, pp. 122:7 – 123:11; 136:2-10). The BPD officers told one of Moore's stylists that she had to go, and the officers removed a flat iron from her hand. (Doc. 35-3, pp. 116:23 – 117:10). Wallace, Paulding, and the BPD officers took items outside of the Barber School; for example, Wallace and the BPD officers took down a television belonging to one of Moore's stylists and placed it outside along with her other items. (Doc. 35-3, pp. 118:17 – 121:20). Furthermore, either Wallace or a BPD officer pushed Moore, although Moore acknowledges he does not know who pushed him. (Doc. 35-3, p. 133:9-18). At that point, everybody inside of the Barber School began to leave the property. (Doc. 35-3, pp. 134:21 – 136:21).

After speaking to Hatcher a second time, Moore returned to the Barber School on September 17, 2014, and has operated the Barber School without incident since that time. (Doc. 35-3, pp. 140:14 – 141:23).

On September 29, 2014, the JCBC filed a complaint in the Circuit Court of Jefferson County, Alabama ("circuit court"), seeking declaratory and injunctive relief against Moore.  (Doc. 37-1, Order and Preliminary Injunction, p. 1).  Moore subsequently filed a motion for preliminary injunction in the state action on January 12, 2015.  (Doc. 37-1, Order and Preliminary Injunction, p. 1).  The circuit court granted Moore's motion on April 16, 2015, and enjoined the JCBC from, in relevant part: (1) failing to act on Moore's license application to the JCBC for the fiscal year 2015; (2) preventing Moore from operating the Barber School; (3) interfering with the operation of the Barber School without providing notice and a hearing prior to interference; and (4) "interfering with the operation of [Moore's] cosmetology business[,]" which is licensed under the State of Alabama. (Doc. 37-1, Order and Preliminary Injunction, p. 13).  The circuit court held that the JCBC denied Moore due process when it ordered him to cease operations on September 16, 2014, because: (1) the JCBC failed to comply with its enabling authority under the Alabama Code; (2) the JCBC wrongfully hired Wallace, who was not qualified for the position under Alabama Code § 45-37-40.02(d), (e), and (f); and (3) the JCBC, which has authority over barber shops only, acted without authority in shutting down Moore's beauty salon on September 16, 2014. (Doc. 37-1, Order and Preliminary Injunction, pp. 11-12).[8]

---

[8]    The Alabama Court of Civil Appeals affirmed the circuit court's permanent injunction

## IV.   DISCUSSION

### A. Federal Due Process Claims against Spoonire

At the outset, it is clear that this constitutional claim is pleaded against Officer Spoonire only; his employer, the City of Birmingham, is not a named defendant with respect to this claim. (*See* Plaintiff's First Amended Complaint, Doc. 17, ¶¶ 33-39). As a result, the court will focus its analysis only upon Officer Spoonire's personal-capacity liability, to which he has pleaded qualified immunity.

### 1. *Qualified Immunity Framework*

Officers sued in their individual capacities may raise qualified immunity as a defense. Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991). Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). At its core, qualified immunity balances "the need for a remedy to protect citizens' rights and the need for government officials to perform their duties without the fear of constant, baseless litigation." Kingsland v. City of Miami, 382 F.3d. 1220, 1231 (11th Cir. 2004).

---

against the JCBC. Jefferson County Barber Commission v. Moore, 221 So. 3d 1082 (Ala. Civ. App. 2015) (unpublished table decision).

Essentially, "[q]ualified immunity 'gives ample room for mistaken judgments' but does not protect 'the plainly incompetent or those who knowingly violate the law.'" Kingsland, 282 F.3d at 1231-32 (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)). These broad principles guide the court.

Qualified immunity first requires Spoonire to prove that he was "'acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Kingsland, 382 F.3d at 1232 (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). If Spoonire demonstrates "that he was acting within his discretionary authority, the burden [then] shifts to [Moore] 'to show that qualified immunity is not appropriate.'" Stephens v. DeGiovanni, 852 F.3d 1298, 1314 (11th Cir. 2017) (quoting Lee, 284 F.3d at 1194). At that point, qualified immunity requires Moore to answer two inquiries in the affirmative: (1) whether his constitutional rights have been violated and (2) "whether the right violated was 'clearly established.'" Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010); see, e.g., Stephens, 852 F.3d at 1314. Moore must answer both inquiries in the affirmative for Spoonire "to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." Id. (citing Person v. Callahan, 555 U.S. 223, 242 (2009)).

Spoonire argues that he is entitled to qualified immunity for both federal law claims arising under the Due Process Clause, reasoning that he was acting within

his discretionary authority and that he did not violate a clearly established law. Moore contends that Spoonire was not acting within his discretionary authority and asserts that Spoonire violated his clearly established rights.

## 2. *Discretionary Authority*

As noted previously, Spoonire must first demonstrate that he was acting within his discretionary authority to be entitled to qualified immunity.   An officer acts within his discretionary authority when his actions "(1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority."   Roberts v. Spielman, 643 F.3d 899, 903 (11th Cir. 2011) (quoting Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994)) (internal quotation marks omitted).  Importantly, "the scope-of-authority inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act."   Grider v. City of Auburn, 618 F.3d 1240, 1262 n.33 (11th Cir. 2010) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004)) (internal quotation marks omitted).   Otherwise, the analysis is nothing "more than an untenable tautology."   Grider, 618 F.3d at 1262 n.33 (quoting Holloman, 370 F.3d at 1266). Therefore, the court looks generally at the officer's actions, "temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an   unconstitutional   manner,   to   an   unconstitutional   extent,   or   under unconstitutionally inappropriate circumstances."   Grider, 618 F.3d at 1262 n.33

(quoting <u>Holloman</u>, 370 F.3d at 1266). Thus, "the question of whether the defendants acted lawfully [is distinct from] the question of whether they acted within the scope of their discretion." <u>Grider</u>, 618 F.3d at 1262 n.33 (quoting <u>Sims v. Metro. Dade Cty.</u>, 972 F.2d 1230, 1236 (11th Cir. 1992).

Under Alabama Code § 36-21-21 (LexisNexis 2013), peace officers "possess all authority to make arrests and to do other things in the preservation of the peace and enforcing the laws as sheriffs may do under the existing laws of the state." Here, Spoonire has testified that he was present at the Barber School to "stand by and make sure no violence" occurred. (Doc. 35-2, Spoonire Affidavit, p. 4; doc. 35-2, Spoonire Deposition, pp. 13:8 – 14:1). Clearly, "standing by" is within Spoonire's powers and duties to preserve the peace as a peace officer. By standing by and ordering Moore to comply with Wallace and Paulding, Spoonire's actions sought to preserve the peace and ensure the interaction between Moore, Wallace, and Paulding did not escalate to a violent confrontation. Although Moore argues that Spoonire acted without lawful authority, Moore appears to recognize in his brief that Spoonire arrived at the Barber School to "stand by."[9]

Moore further argues that Spoonire exceeded the scope of his authority. However, Moore appears to argue that Spoonire' actions were "committed . . . in

---

[9] The court notes that Moore contends that Spoonire never informed Moore that Spoonire was there to "stand by." However, the court does not find this dispositive; in a domestic disturbance situation, where one party calls the police, officers are under no duty to inform the parties that they are there to "stand by" and ensure no violence occurs. Likewise, Spoonire was under no duty to inform Moore that he was dispatched to the scene in order to "stand by."

an unconstitutional manner, to an unconstitutional extent, or under unconstitutionally inappropriate circumstances." Grider, 618 F.3d at 1262 n.33 (quoting Holloman, 370 F.3d at 1266). None of these situations supports finding that Spoonire exceeded the scope of his authority. See id. When he placed his hand on his gun and ordered Moore to comply with Wallace and Paulding, Spoonire still was acting to preserve the peace. Whether Moore felt intimidated or feared for his life does not negate the fact that the action furthered Spoonire's purpose of preserving the peace. By placing his hand on his gun, Spoonire prevented further escalation of the situation by convincing Moore to leave the Barber School. Therefore, Spoonire preserved the peace, which means that he did not exceed his authority.[10]

Because Spoonire has demonstrated that he was acting within his discretionary authority on September 4, 2014, the burden shifts to Moore to demonstrate that Spoonire is not entitled to qualified immunity. Stephens, 852 F.3d at 1314.

### 3. *Due Process Claims*

To preclude application of qualified immunity, Moore must now demonstrate both that his constitutional rights have been violated and that "the right[s] violated w[ere] 'clearly established.'" Brown, 608 F.3d at 734. Under the

---

[10]     As explained supra in note 2, at 4, Deputy Chief Hatcher's purported statement to Moore does not change the analysis or provide substantial proof that Spoonire exceeded his authority.

Due Process Clause of the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  The Supreme Court has interpreted the Due Process Clause to embody both substantive due process and procedural due process.  See Zinermon v. Burch, 494 U.S. 113, 125 (1990); see also McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994).  A violation of either form of due process "may form a basis for suit under [42 U.S.C. § 1983]."  McKinney, 20 F.3d at 1555 (citing Zinermon, 494 U.S. at 125).

Moore argues that Spoonire violated his substantive and procedural due process rights by depriving him both of the right to possess and use the building occupied by the Barber School and the right to operate the Barber School under his license with the JCBC, rights that he contends are clearly established under the Due Process Clause.[11]  Spoonire asserts that he did not violate any of Moore's clearly established rights.  The court agrees that Spoonire did not violate Moore's

---

[11]    It is unclear to the court whether Moore argues that these rights are solely substantive, solely procedural, or a combination of both substantive and procedural.  For reference, in his complaint, Moore identifies the following rights as substantive: the right "to be free in the enjoyment of all his facilities;" the right "to be free to use them in all lawful ways;" the right "to live and work where he will;" the right "to earn his livelihood by any lawful calling;" and the right "to pursue any livelihood or avocation."  (Doc. 17, ¶ 48).  He then asserts that "liberty interests incorporate his ability to pursue and engage in his occupation as a barber instructor . . . [and] to operate a barber school.  (Doc. 17, ¶ 49).  Moore further identifies the following rights as procedural:  the right "to operate a barber school and beauty salon" pursuant to his occupational licenses and "the right to be employed as a barber instructor[.]"  (Doc. 17, ¶ 34).

substantive or procedural due process rights, and therefore, it is immaterial whether the "rights" were clearly established.

a. Substantive Due Process

Substantive due process protects fundamental rights, *i.e.*, "rights that are 'implicit in the concept of ordered liberty.'" McKinney, 20 F.3d at 1556 (quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)). As explained in McKinney, "[t]he Supreme Court has deemed that most – but not all – of the rights enumerated in the Bill of Rights are fundamental; certain unenumerated rights . . . also merit protection." 20 F.3d at 1556. For example, unenumerated rights include "'the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion.'" Doe v. Moore, 410 F.3d 1337, 1343 (11th Cir. 2005) (quoting Washington v. Glucksberg, 521 U.S. 702, 720 (1997)). However, the Supreme Court reluctantly recognizes very few new fundamental rights under the Due Process Clause

> because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–226, 106 S. Ct. 507, 513–514, 88 L. Ed. 2d 523 (1985). The doctrine of judicial self-restraint requires [the Supreme Court] to exercise the utmost care whenever [it is] asked to break new ground in this field.

<u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992).

A fundamental right "is protected 'against "certain government actions regardless of the fairness of the procedures used to implement them."'" <u>McKinney</u>, 20 F.3d at 1556 (quoting <u>Collins</u>, 503 U.S. at 125 (quoting <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986))). "[N]o amount of process can justify [the] infringement" of a fundamental right. <u>McKinney</u>, 20 F.3d at 1556. Therefore, "[a] violation of a substantive due process right . . . is complete when it occurs[.]" <u>Id.</u>

Notably, "'not every wrong committed by a state actor rises to the level of a "constitutional tort,"' sufficient to trigger a substantive due process violation[.]'" <u>Maddox v. Stephens</u>, 727 F.3d 1109 (11th Cir. 2013) (quoting <u>Lee v. Hutson</u>, 810 F.2d 1030, 1032 (11th Cir. 1987)). As explained in <u>McKinney</u>, "areas in which substantive rights are created only by state law. . . are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.'" 20 F.3d at 1556 (quoting <u>Regents</u>, 474 U.S.at 229). Rights created by state law "may be rescinded so long as the elements of procedural – not substantive – due process are observed." <u>McKinney</u>, 20 F.3d at 1556.

Here, in sum and substance, Moore alleges that Spoonire violated his fundamental "right to engage in the common occupations of life to run his

business." (Doc. 37, p. 26). The evidence demonstrates that Spoonire ordered Moore to comply with Wallace and Paulding only after learning from Wallace and Paulding that Moore failed pay the requisite license fees to the JCBC to keep his license current. By ordering Moore to comply, Spoonire prevented Moore from operating the Barber School as a barber instructor on September 4, 2014.

However, Moore possessed the right to operate the Barber School only with current licenses issued by the JCBC. Notably, Moore's licenses with the JCBC were created by state law. See Ala. Code §§ 45-37-40 to -40.05. Consequently, the purported violation of Moore's right involves a state-created right, namely the right to operate the Barber School through the licenses issued by JCBC. Because Moore's harm stems from Spoonire's actions in shutting down the Barber School, which Moore could only operate with licenses created by state law, Moore's right is not protected by substantive due process. His right is protected only by procedural due process. The court's "responsibility . . . is to examine [Moore's] cause of action for what it actually is, not for what [Moore] would have it be." McKinney, 20 F.3d at 1560. The right identified by Moore involves a property interest, which will be analyzed below to determine whether procedural due process affords any relief.

Therefore, no fundamental rights have been implicated in the above-styled action necessary to support a substantive due process claim.[12] Accordingly, because no fundamental right has been implicated, let alone violated, Spoonire is entitled to qualified immunity as to any substantive due process claim, and Count IV is due to be dismissed.

### b. Procedural Due Process

A procedural due process claim requires Moore to establish three elements: "a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process." Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994). To deprive an individual of a property interest "some form of hearing is required." Matthews v. Eldridge, 424 U.S. 319, 333 (1976). Therefore, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Matthews, 424 U.S. at 333; see also Cryder, 24 F.3d at 177 ("Due process entitles an individual to notice and some form of hearing before state action may finally deprive him or her of a

---

[12]    To the extent Moore alleges in his complaint a violation of rights actually protected by substantive due process, the record is devoid of any evidence that supports any inference of an arguable violation of such fundamental rights. Furthermore, to the extent Moore makes a general economic substantive due process claim, the law simply does not protect economic rights under substantive due process. See Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot., 560 U.S. 702, 721 (2010) ("[W]e have held for many years (logically or not) that the 'liberties' protected by Substantive Due Process do not include economic liberties. See, e.g., Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co., 335 U.S. 525, 536, 69 S. Ct. 251, 93 L. Ed. 212 (1949).").

property interest."). Thus, at its core, "[d]ue process is a flexible concept that varies with the particular situation." Cryder, 24 F.3d at 177.

Generally, due process requires notice and hearing before a state actor may deprive an individual of his liberty or property interest. See Quik Cash Pawn & Jewelry, Inc. v. Sheriff of Broward Cty., 279 F.3d 1316, 1322 (11th Cir. 2002). However, that rule is not absolute. See Parratt v. Taylor, 451 U.S. 527, 540-41 (1981); Hudson v. Palmer, 468 U.S. 517, 533 (1984) (both Parratt and Hudson standing for the proposition that a post-deprivation means of redress satisfies procedural due process). A pre-deprivation hearing is not required "where the holding of such a hearing would be impracticable, that is, where the deprivation is the result of either a negligent or intentional deprivation of property[,]" McKinney, 20 F.3d at 1562-63, so long as "a full and meaningful hearing will be available" at some reasonable time, Reams v. Irwin, 561 F.3d 1258, 1263 (11th Cir. 2009). "All that due process requires. . . is a post-deprivation 'means of redress for property deprivations satisfy[ing] the requirements of procedural due process.'" McKinney, 20 F.3d at 1563 (quoting Parratt, 451 U.S. at 537).

Importantly, in contrast to "substantive due process violations, procedural due process violations do not become complete 'unless and until the state refuses to provide due process.'" McKinney, 20 F.3d at 1562 (quoting Zinermon, 494

U.S. at 123).[13]   Therefore, "the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise."  McKinney, 20 F.3d at 1557; see also Cotton v. Jackson, 216 F.3d 1328, 1331 (11th Cir. 2000) ("It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of the protected interest that gives rise to a federal procedural due process claim.").  In other words, "even if a procedural deprivation exists . . ., such a claim will not be cognizable under [42 U.S.C.] § 1983 if the state provides a means by which to remedy the alleged deprivation."  Foxy Lady, Inc., v. City of Atlanta, 347 F.3d 1232, 1238 (11th Cir. 2003).  The Eleventh Circuit reasons that "the state must have the opportunity to 'remedy the procedural failings of its subdivisions and agencies in the appropriate fora – agencies, review boards, and state courts' before being subjected to a claim alleging a procedural due process violation.  Cotton, 216 F.3d at 1331 (quoting McKinney, 20 F.3d at 1560).

Therefore, the relevant inquiry for a procedural due process claim focuses on the availability and adequacy of state remedies.  As explained in Cotton, "[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of

_____

[13]      The rule announced in McKinney applies to both property-interest and liberty-interest procedural due process claims.  Cotton v. Jackson, 216 F.3d 1328, 1331 n.1 (11th Cir. 2000).

procedural due process." 216 F.3d at 1331 (quoting McKinney, 20 F.3d at 1565).

The failure "to avail [one]self of the full procedures provided by state law . . . does

not constitute a sign of their inadequacy." McKinney, 20 F.3d at 1565.[14]   An

adequate "state procedure need not provide all the relief available under section

1983[,]" only the relief necessary "to correct whatever deficiencies exist and to

provide [the] plaintiff with whatever process is due." Cotton, 216 F.3d at 1331.

In Freeman v. Town of Eatonville, 225 F. App'x 775 (11th Cir. 2006), the

plaintiff owned and operated a nightclub.  One weekend, the plaintiff's nightclub

attracted a large crowd, and the police were dispatched to subdue a disturbance.

One officer told the plaintiff that he was closing the nightclub, which prompted the

plaintiff to stand in front of the nightclub's doors.  The officer ordered the plaintiff

to step away, and eventually, the plaintiff complied.  The officers dispersed the

crowd, but the nightclub remained closed that night and reopened the following

---

[14]     As explained in McKinney, "the Supreme Court held [in Patsy v. Board of Regents, 457
U.S. 496, 516 (1982)] that section 1983 plaintiffs were not required to avail themselves of
available state remedies before suing in federal court; the Court's holding presumed the presence
of a valid constitutional claim." McKinney, 20 F.3d at 1564 n.20.  In other words, under Patsy,
once the plaintiff suffers a constitutional violation, the plaintiff may bring a section 1983 claim
in either state or federal court, regardless of whether he exhausted state remedies.

     However, a procedural due process claim requires a showing that state remedies were
inadequate to redress a procedural deprivation. McKinney, 20 F.3d at 1557, 1563-64; see also
Parratt, 451 U.S. at 537; Hudson, 468 U.S. at 533.  Therefore, in the absence of an allegation of
inadequate state remedies, a plaintiff does not have a claim and does not reach the non-
exhaustion rule announced in Patsy because the plaintiff does not have a viable claim to bring in
either state or federal court.  In fact, the very nature of a procedural due process claim brings it
out from under the rule announced in Patsy.  If the state does not provide an adequate procedure
and remedy, the plaintiff necessarily could bring his claim only in federal court; to first bring the
claim in state court would be a fool's errand.  See McKinney, 20 F.3d at 1564 n.20; see also
Tinney v. Shores, 77 F.3d 378, 382 (11th Cir. 1996).

night.  The Eleventh Circuit held that the plaintiff's procedural due process claim failed, reasoning that the plaintiff "could have pursued remedies in state court for lost profits or damages suffered by the club's closure." Freeman, 225 F. App'x at 780.  Therefore, the plaintiff "suffered no procedural due process violation" because he could have pursued relief in state court. Id.

Here, Moore argues that Spoonire violated his procedural due process rights by failing to provide notice and a hearing prior to the deprivation of his property interests, that is his right to occupy the Barber School and his right to operate the Barber School pursuant to his license issued by the JCBC.  Essentially, Spoonire acted as an agent of the JCBC when he assisted Wallace and Paulding in shutting down the Barber School after Paulding requested the assistance of a police officer in shutting down a barber shop and the City dispatched Spoonire to the Barber Shop.  Both Spoonire's order for Moore to comply with Wallace and Paulding and his action in ushering Moore out of the Barber School furthered Paulding's request (and the JCBC's goals) in shutting down the Barber School.  Spoonire's actions prohibited Moore from occupying the Barber School and assisted Paulding and Wallace in preventing Moore from operating the Barber School, which basically had the same effect of suspending Moore's licenses with the JCBC.

Moore, however, has failed to allege or prove that the state failed to provide any meaningful post-deprivation procedure and remedy; in fact, the record

substantially belies such a contention. An appeal to state court exists for most actions taken by the JCBC regarding the suspension or revocation of a license issued by the JCBC.[15] Moore could have requested the JCBC to explain its reasoning for suspending or revoking his license, and he could have appealed the JCBC's findings. When deciding the appeal regarding the suspension or revocation of Moore's license, the state court could have considered other injunctive relief concerning the right to occupy the Barber School. Moreover, because the JCBC is a county agency, he likely could have sued it for damages if the closure was wrongful.[16]

---

[15]     Alabama Code § 45-37-40.04(e) provides:

> If the commission shall determine that any applicant is not qualified to receive a license, or that any licensee is guilty of a violation of any of this part, a license shall not be granted, or the license shall be suspended or revoked, as the case may require. Upon request of the applicant or licensee in writing, the commission shall furnish the party with a definite statement of its findings of facts and its reason or reasons for refusing to grant the license or for its suspension or revocation of the license. The findings of the commission may be appealed to the circuit court of the county in which the principal office of the commission is located, provided an appeal is taken within 30 days after final determination of the commission. Any person desiring to appeal under this subsection shall file with the commission or some member thereof, a notice in writing that he or she appeals to the circuit court, with at least two solvent sureties payable to the county wherein the case will be tried, conditioned to prosecute such appeal to effect, and upon failure to do so, to pay all costs and damages which may be taxed against him or her by the circuit court on appeal. The bond to be approved by the circuit clerk of the county and any cause so appealed shall be tried de novo in circuit court.

(emphasis added).

[16]     Of course, it should be remembered that on the occasion that Spoonire assisted agents of the JCBC, the plaintiff admits that he had not paid his license renewal fee and, in fact, the Barber

Significantly, the record indicates that the state did afford process to Moore regarding the actions of the JCBC, Wallace, and Paulding. The JCBC brought an action against Moore, seeking to have the court declare Moore under the JCBC's jurisdiction. As a result, Moore filed a motion seeking injunctive relief against the JCBC. The court granted his motion and afforded Moore injunctive relief against the JCBC and its agents. The state court's injunction allowed Moore to continue to operate his Barber School and prevented the JCBC from depriving Moore of his rights to operate the Barber School without due process. The injunction entered against the JCBC had the effect of remedying the violation of his right to occupy the Barber School as well.

State law either provided or could have provided a procedure and remedy sufficient to redress Moore's injuries stemming from Spoonire's alleged deprivation of Moore's property interests. Because Spoonire's actions were closely intertwined with the suspension of his licenses, Moore likely could have brought a related claim against Spoonire in that action for the deprivation of his rights to occupy and operate the Barber School. Notably, the injunction prevented the JCBC and its agents from interfering with his business. Therefore, Moore was granted an injunction that would prevent an officer from helping the JCBC in shutting down the Barber School without notice and a hearing as required by

School was not open for business that week. It seems unlikely that the plaintiff could have suffered lost business-income damages at a time when his business was not open for trade.

Alabama Code § 45-37-40.04(d). However, in the event Spoonire did not act as agent of the JCBC in shutting down the Barber School, Moore could have pursued a separate action in state court, consistent with the holding in <u>Freeman</u> regarding a similar plaintiff whose business was shut down for a night by a police officer. Thus, Moore had available state procedures and remedies at his disposal to redress the deprivation of his rights to occupy and operate the Barber School.

Accordingly, because Moore has failed to allege the inadequacy of any state procedure and remedy, Spoonire is entitled to qualified immunity as to any procedural due process claim, and Count I is due to be dismissed.

### B. Failure to Train, Discipline, and Supervise Claim against Roper

From the face of his amended complaint (doc. 17) and his response to the motion for summary judgment (doc. 37), it is not entirely clear to the court whether Moore asserts a federal failure-to-train claim, a state failure-to-train claim, or

both.[17]  To the extent a federal failure-to-train claim has been alleged, the court will consider the claim in this section.[18]

As an initial matter, Moore likely has abandoned the federal failure-to-train claim because he did not respond to arguments advanced by the defendants in their motion for summary judgment.  See Solutia, Inc., v. McWane, Inc., 672 F.3d 1230, 1239 (11th Cir. 2012) (quoting Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 598 (11th Cir. 1995) ("Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  Regardless of any potential abandonment, Moore cannot assert a federal failure-to-train claim against Roper because Moore did not suffer a constitutional violation.  See Hicks v. Moore, 422 F.3d 1246, 1253 (11th Cir. 2005) ("Because we conclude that Plaintiff's constitutional rights were not violated by the search, Plaintiff cannot maintain a § 1983 action for supervisory liability against Sheriff Moore, Captain Ausburn, or Sergeant Gosnell for failure to train. *Rooney v. Watson*, 101 F.3d 1378, 1381 n.2 (11th Cir.1996).").

---

[17]     Moore does not allege that he brings Count VI under 42 U.S.C. § 1983 against Roper. However, he does allege that Roper acted with deliberate indifference in his failure to train and supervise officers within the BPD.  Therefore, the court construes Moore's amended complaint to raise a federal failure-to-train claim.  Furthermore, Moore argues that the City is not absolved from liability on state-law claims due to the "negligent, careless, and unskillful acts of Spoonire *and Roper*."  (Doc. 37, pp. 29-30) (emphasis added).  Because Moore insinuates that Roper was negligent and because Moore brings only one count against Roper, the court construes this vague statement to demonstrate that Moore seeks to prosecute a negligent failure-to-train claim under state law against Roper as well.

[18]     Like Spoonire, Moore has sued Roper in his individual capacity.  See supra note 8, at 12.

Alternatively, despite the existence of the previous bars, Moore has failed to come forward with evidence to support a federal failure-to-train claim against Roper. Under Cottone v. Jenne, "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.1999)). However, a supervisor assumes "liability under § 1983. . . when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Cottone, 326 F.3d at 1360 (citing Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003)). Here, because Moore has failed to present evidence demonstrating that Roper personally participated in any unconstitutional conduct, he must establish a causal connection between Roper's action or inaction and the alleged constitutional violation. Cottone, 326 F.3d at 1360.

Moore can establish the causal connection in one of three ways. First, Moore can establish "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and [the supervisor subsequently] fail[ed] to do so[.]'" Gonzalez, 325 F.3d at 1234 (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)). Second, Moore can

prove "the supervisor's improper 'custom or policy . . . resulted in [a] deliberate indifference to constitutional rights[.]'" Gonzalez, 325 F.3d at 1234 (quoting Rivas, 940 F.2d at 1495); see also Belcher v. City of Foley, 30 F.3d 1390, 1397 (citing City of Canton v. Harris, 489 U.S. 378, 388-390 (1989) ("Only when the failure to train amounts to 'deliberate indifference' can it properly be characterized as the 'policy' or 'custom'' that is necessary for section 1983 liability to attach."). Finally, Moore can put forth evidence "which support[s] an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. Gonzalez, 325 F.3d at 1235 (citing Post v. City of Fort Lauderdale, 7 F.3d 1552, 1561 (11th Cir. 1993)).

Moore has failed to come forward with any evidence necessary to establish a causal connection. The evidentiary record is devoid of proof establishing that Roper was aware of widespread abuse by officers in "stand by" situations. See Braddy v. Fla. Dep't of Labor and Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998) (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences."). Nor is there evidence that Roper directed Spoonire to act unlawfully, or that Roper knew that Spoonire would act unlawfully and failed to

stop him. However, Moore possibly asserts that Roper knew his officers would deprive Moore of his purported rights a second time (*e.g.*, on September 16, 2014) and failed to stop them. Although it is conceivable that Roper received notice of Moore's situation after Moore contacted Hatcher, the court must speculate as to whether Hatcher actually informed Roper of the phone call. Moore has not come forward with evidence that Hatcher normally and consistently reports telephonic grievances to Roper. In the absence of such evidence, the court cannot reasonably infer that Hatcher relayed the contents of Moore's grievance to Roper, which is required to satisfy Rule 56. Therefore, the court cannot reasonably infer that Roper knew that his officers would act unlawfully.

Finally, Moore has not demonstrated that Roper has a custom or policy that resulted in a deliberate indifference to Moore's constitutional rights. Moore has not rebutted Roper's affidavit, which sets out the zealous training that BPD officers undergo both before and after joining the police force. (See doc. 35-2, pp. 2-6). Moore appears to rely on the two incidents at the Barber School in September of 2014 to demonstrate that Roper had a custom or policy of inadequately training his officers whereby Moore suffered harm from the failure to train. See Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) ("To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality [knew] of a need to train . . . in a particular area and

the municipality made a deliberate choice not to take any action.").  In the absence of showing deliberate indifference, one or two incidents alone cannot equate a supervisor's policy or custom of failing to train, necessary to allege a constitutional injury under section 1983.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (footnotes omitted) ("But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.").

Accordingly, because Moore has failed to come forward with sufficient evidence to establish an adequate causal connection between Roper's actions or inactions and the alleged constitutional violation, Moore has not established a federal failure-to-train claim, and any federal failure-to-train claim against Roper in Count VI is due to be dismissed.

### C.  Other Remaining State Law Claims

Moore also asserts the following state-law claims: Count VI - Trespass against Spoonire; Count VII – Negligent Failure-to-Train against Roper;[19] and Count VIII – Agency against the City for the torts of its employees.[20]

### 1.  Trespass Against Spoonire—Count VI

Moore alleges that Officer Spoonire committed a common law trespass on September 4, 2014, by entering the Barber School to assist Wallace and Paulding shut down his business.  This claim fails on the plaintiff's own testimony that *he* invited Wallace, Paulding, and Spoonire into the Barber School because they were "making a scene."  To prove a claim for common law trespass, the plaintiff must offer evidence the Spoonire entered his business "without right, lawful authority, or express or implied invitation, permission, or license…."  Yeilding v. Riley, 705 So. 2d 426, 429 (Ala. Civ. App. 1997) (quoting 65 C.J.S. Negligence § 63(3)(1966)).  "'[A]s an application of the general rule that one may not maintain an action for a wrong to which he has consented, consent or license may be a defense to an action of trespass,' and '[c]onsent may be implied from custom, usage or conduct.'  75 Am.Jur.2d Trespass § 41 (1974).  Consent is a defense to an

---

[19]  As discussed supra in note 16, it is possible that Moore has alleged a state-law failure-to-train claim against Roper.

[20]  Because all federal claims in this case are due to be dismissed, the court could decline to exercise supplemental jurisdiction over the remaining state-law claims.  However, because the case has progressed to this point, the court will exercise its discretion to address the state-law claims as well.

action for damages for trespass." McCaig v. Talladega Pub. Co., 544 So. 2d 875, 879 (Ala. 1989) (citing Bobo v. Young, 258 Ala. 222, 61 So.2d 814 (1952)).  Here, it is undisputed that Moore asked Spoonire to come into the Barber School. Spoonire's acceptance of the request cannot be a trespass.  This claim is due to be dismissed.

### 2. Negligent Failure to Train against Roper—Count VII

Moore also seems to allege a claim against Chief Roper under state law for negligent failure to train Spoonire.  This claim fails also because Roper was not Spoonire's employer, but only a supervisor charged by the employer with conducting training.[21]  It is the legal duty of the employer to train its employees, and it may discharge that duty by tasking other employees with the job of performing that training.  Nevertheless, such training employees do not owe a legal duty to others to perform the training in any particular manner; it is the employer's duty.  A person injured by a police officer who was trained improperly might be able to sue the city that employs the officer, but he cannot sue the training officer tasked by the city with performing the training because a negligent failure to train claim requires a master-servant relationship.  Ott v. City of Mobile, 169 F. Supp. 2d 1301, 1314 (S.D. Ala. 2001).

---

[21]     Moore has not sued the City of Birmingham, Spoonire's employer, for negligent failure to train.

Moreover, even if Moore could sue Chief Roper, as Spoonire's supervisor, for negligently failing to train Spoonire, Chief Roper is entitled to peace officer immunity under Alabama Code § 6-5-338 (1975). Specifically, § 6-5-338 states:

> (a) Every peace officer and tactical medic, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as a peace officer or tactical medic by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers or tactical medics, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.
>
> (b) This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers. No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off-duty hours.

Under Alabama precedent, "if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune. Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003).

Under this form of immunity, Chief Roper must first "establish (1) that [he was a] peace officer[ ] (2) performing law-enforcement duties at the time of the [incident] and (3) exercising judgment and discretion." Ex parte City of Homewood, 231 So. 3d 1082, 1087 (Ala. 2017). Moore does not dispute that Chief Roper was "employed as [a] law-enforcement officer[ ] by" the City; Therefore, he was a 'peace officer' for the purposes of § 6-5-338(a) . . . ." Id. Moore likewise does not dispute that, in providing training for subordinate police officers, Chief Roper was performing a "law-enforcement" duty and that he exercised discretion in doing so. For these reasons, the actions and decisions made by Chief Roper in relation to training the officers of the Birmingham Police Department cannot be a basis for liability because of Chief Roper's peace-officer immunity under Alabama law. This claim is due to be dismissed.

### 3. Agency against the City for the Torts of its Employees—Count VIII

Finally, Moore alleges that the City of Birmingham is liable for the torts of its employees—here, Officer Spoonire and Chief Roper—under agency principles. The question presented, therefore, is whether the City can be made liable for an alleged trespass by Spoonire and an alleged negligent failure to train by Chief Roper. Both claims are meritless.

First, as determined above, Spoonire did not commit a trespass tort because he was *invited* into Barber School by Moore. Moore's own undisputed testimony

is that he asked Spoonire, Wallace, and Paulding to come into the Barber School because they were "making a scene" outside. An invite is not liable for a trespass. Because Spoonire did not commit a trespass, there is nothing to hold the City liable for on agency grounds. For a principal to be liable for the torts of his agent, the agent must have committed a tort, and that simply did not occur when Spoonire was invited into the Barber School on September 4, 2014.

For the same reasons explained above with respect to the claim against Chief Roper's for negligent training. Because Chief Roper was a law enforcement officer covered by the peace officer immunity in Alabama Code § 6-5-338(a), the municipality that employed him also is immune from liability under state law pursuant to Alabama Code § 6-5-338(b). "[I]f a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003).

State-law claims against the City of Birmingham based on the actions of Officer Spoonire and Chief Roper are due to be dismiss.

## V.  CONCLUSION

Accordingly, the motion for summary judgment (doc. 35) is due to be GRANTED, and all of Moore's federal-law and state-law claims are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered.

DATED this 29th day of June, 2018.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE